UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK COOPER,<br><br>      Plaintiff,<br><br>v.<br><br>UPSTAIRS, DOWNSTAIRS OF NEW YORK, INC., MICHAEL GRUMMONS, ROBERT DE BENEDICITS, and PAUL GALLUCCIO,<br><br>      Defendants. | Civil Action No.: 1:18-cv-6426<br><br>U.S.D.C. |

**Motion to Strike the Reports and Preclude Testimony by Dr. Siegel and Mr. West, Both Plaintiff's Experts By All Defendants Pursuant to FRE 401 & 402**

Thomas D. Shanahan
Thomas D. Shanahan, P.C.
551 Fifth Avenue, Thirty-First Floor
New York, New York 10176
(212) 867-1100, x11

# Table of Contents

Memo of Law

| | Pages |
|---|---|
| Factual Background to Motion | 1 |
| Argument | 15 |
| Conclusion | 16 |

Statutes

| | |
|---|---|
| Federal Rules of Evidence ("FRE") 702, Pub. L. 93–595, §1, an. 2, 1975, 88 Stat. 1937; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011. | 15, 16, 17 |

Cases

| | |
|---|---|
| Amorgianos v. Nat'l R.R. Passenger Corp. 303 F.3d 256 (2nd Cir. 2002) | 16 |
| Danley v. Bayer 2016 U.S. LEXIS 29752 (S.D.N.Y. 2016) | 16 |
| Daubert v. Merrell Dow Pharm, Inc. 509 U.S. 579, 113 S.Ct. 2786 (1993) | 16 |
| Nimely v. City of New York 414 F.3d 381, 396 (2nd Cir. 2005) | 16 |
| Stagl v. Delta Air Lines, Inc. 117 F.3d 76, 81 (2nd Cir. 1997) | 16 |

## Factual Background As Relevant

On August 31, 2018, Plaintiff Mark Cooper ("Cooper" or "Plaintiff") filed the Amended Complaint in this action. See ECF Doc. 16. In the Amended Complaint, Plaintiff alleged substantial and egregious daily acts of purported discrimination based upon his actual or perceived sexual orientation and race. See Id. He also alleged a severe and pervasive pattern of sexual harassment perpetrated by Defendant Michael Grummons. Id. The allegations include purported unlawful comments made by Grummons, many of which are pled in quotation marks.

On December 12, 2018, all Defendants answered the Amended Complaint. See ECF Docs. 43, 44. In their answer, Defendants all pled general denials. It is conceded that Defendants Paul Galluccio ("Galluccio") and Robert DeBennedictis ("Debenedictis"), never met, worked with or supervised Plaintiff. It is also conceded Galluccio and DeBennedictis reside in Fort Lauderdale, Florida, and were not physically present at Defendant Upstairs/Downstairs *dba* The Townhouse Bar ("Townhouse"), during the period at issue in the Amended Complaint. After the issue was joined, substantial party and third-party discovery took place, often only after rulings by the then assigned Judge Richard Woods, ordering Plaintiff to comply.

*Economic Damages Have Been Withdrawn*

Given Plaintiff cannot remember the last time he filed and paid taxes and could not produce any tax records in discovery, he withdrew all claims for economic damages.[1] In a

---

[1] Plaintiff and his counsel represented that tax returns were filed and would be produced in early January. However, they were never produced forcing Defendants to spend substantial time and expense attempting to obtain tax returns and other financial records. Only after the IRS and State confirmed no records exist did Plaintiff withdraw his economic damages claims.

1

conference call with the Honorable Judge Woods on March 6, 2019, it is undisputed Plaintiff withdrew all economic damage claims contained in the Amended Complaint. The following categories of damages have been withdrawn: lost wages, back pay, front pay, future lost wages, and reputational damages. See ECF Doc. 56 Transcript of Conference dated March 6, 2019, pgs. 3-7, Deposition Transcript of Cooper, Exhibit A, pg. 69/17-25, 70/1-7. Accordingly, the remaining category of damages are limited to emotional distress, medical expenses and punitive damages. Plaintiff conceded he has not incurred any medical expenses as a result of the allegations contained in the Amended Complaint. This includes not receiving therapy or having any medications prescribed. Id., pg. 73, 75. He confirmed he has not seen any medical providers for treatment relating to the complaint. He further testified the only professional he has seen is Dr. Siegel, the forensic expert retained by Plaintiff's counsel, the Derek Smith Law Group. Id., 73, 74, 75, 76 & 77. Plaintiff testified that as a result of the purported conduct of Grummons, he "[has] anxiety, doubt in his performance, panic attacks and recurring nightmares". Id., pg. 77/7-11.[2]

*Plaintiff repeatedly testified to
"One incident" with Mr. Grummon's
Although the Amended Complaint Asserts
Pattern and Practice*

Although the Amended Complaint pleads a pervasive and continuing pattern and practice of unlawful discrimination that allegedly continued on a daily basis, at his deposition, Plaintiff consistently testified to one purported incident with Mr. Grummons. Id., pgs. 75,77, 84, 88, 104, 106, 107, 113, 130, 134, 203, 211, 215, 238, 239, 242, 244, 246, 247, 250. Given

---

[2] Even though Plaintiff never sought treatment and manifests nothing more than garden variety damages, he is seeking $3 million in compensatory damages and $8 million in punitives. Id., pg. 80/21-22, 87/1-8.

2

this inconsistency, Plaintiff was asked what incident he was referring to. The following colloquy took place on the record.

> "Q: You keep referring to it as the incident. What does that mean?
> A: Well, what occurred, the incident that occurred, what transpired between Mr. Grummons and I." Id., pg. 77/14-18.

This important fact undercuts any argument by Plaintiff's counsel that he can make a compelling argument to a trier of fact for punitive damages. In the context of an employment action, an award of punitive damages is intended to punish a bad actor and deter further egregious conduct by the wrong-doer and others similarly situated. Almost always, the wrong-doer had prior bad acts and/or a history of unlawful conduct. The facts here could not be more different. All Defendants, including Upstairs/Downstairs, have never in decades of business, been accused of any conduct remotely close to the allegations herein and have never been had any previous lawsuits. It is undisputed that all three individual defendants have had no prior administrative complaints or lawsuits commenced against them based upon alleged discrimination and/or sexual harassment. This is an additional factor that makes an award of punitive damages unlikely, if not impossible.

*All employees deny observing Plaintiff*
*Being subjected to unlawful conduct or*
*Plaintiff reporting same*

Although Plaintiff testified to reporting the unlawful conduct to an Assistant Manager and discussing it with other employees, all employees deny any discussion of the issues raised in this litigation or any complaint by Plaintiff. Id., pg. 58-60, 195-200.

3

*The Deposition of Mark Cooper*

The deposition of the Plaintiff took place on March 18, 2019. Plaintiff was evasive for the entire deposition about almost every substantive question, including simple one's for example, "Where do you live?" The following colloquy took place in regard to where the Plaintiff resides.

> "Q: How long did you live at that address in Jamaica Estates that you can't recall?
> A: Two years.
> Q: The 205-h02 114th Drive address, you lived there for four years, correct?
> A: Correct.
> Q: Since 2015, it would be fair to say?
> A: Around, about.
> Q: Would it be fair to say that was your address at all times relevant to this case?
> A: I had resided in the Bronx as well.
> Q: What does that mean?
> A: I lived, I didn't really live, but I was at a different address. I had a family member there so I made appearances, just to check on her." Id., pg. 7/2-21."

Plaintiff admitted that the address on the resume he sent Mr. Grummons, at the time he solicited employment from the Defendants was not the address at which he then resided. Id., pg. 14/113-16. Plaintiff had not resided at that address for more than six years, but never updated his resume to reflect his correct address. Id., pg. 15/6-16. In fact, Plaintiff continues, almost three two years after he was terminated by Defendant, to use an incorrect address on his resume. Id., pg. 18/8-15. However, not only is the address on Plaintiff's resume out-of-date. The address on his New York State Driver's License is also more than four years out-of-date. Id., pg. 20-21. The following colloquy took place:

> "Q: Why have you not updated your address so it's current with the New York State Department of Motor Vehicles?
> A: I just haven't had the time to do it." Id., pg. 21/5-9.

4

The 53-year old Plaintiff testified he pays his expenses from "cash" but refuses to explain where the cash comes from. Id., pg. 32, 33. Plaintiff cashed all checks from Defendants at a check cashing store as the "CEO" of Blue Ocean. Id., pg. 141-143. Although his Amended Complaint alleges he was "forced" to be paid through Blue Ocean in retaliation for rejecting the sexual advances by Mr. Grummons, he denied this at his deposition. Id., pg. 145 (line 6)-148. He testified that he lives in his Mother's house and she pays all his expenses. Id., pg. 34/13-18. He testified that he cannot pay his bills and his mother covers all his expenses because he is not "gainfully employed". Id., pg. 34/20-21. He testified his mother pays for his food, cell phone and gives his financial help. Id., pg. 36, 37. Even more disturbing is the Plaintiff claims 92-year-old Ms. Rodriguez, for whom Plaintiff has power-of-attorney and health care proxy, also willingly gives him financial help and doesn't mind him paying his bills from her account. Id., pg. 8/3-25.37/11-25, 38/1-21, Plaintiff later confirmed that he has used Ms. Rodriguez' address as the business address for Blue Ocean Entertainment Group ("Blue Ocean"), a limited liability company in which he and his husband, Anjan Awald, are the only members. Id., pgs. 9/14-16, 38, 39, 40. He also testified he pays some of his expenses from *her* bank account. Id., pg. 38. Although Plaintiff concedes he owes outstanding child support and decades of unfiled and unpaid taxes, he denies that his use of the incorrect address has anything to do with his desire to have creditors and law enforcement trying to locate him. Id., pg. 52.

*Plaintiff Lied to Grummons'*
*At the Time he was Hired*

Plaintiff mislead Defendant Grummons' into thinking that he was previously employed by the Defendants. When questioned at his deposition about when he worked for Defendants, Plaintiff testified he could not remember. Id., pg. 54. He also could not remember who he

5

worked with and the full name of his manager. Id., pg. 54-55. As stated earlier, Plaintiff concedes he has never had a conversation with either Defendant Galluccio or Debenedictis. Id., pg. 56.

*Plaintiff Lied About Current and Past Employment*

At his deposition, Plaintiff claimed to be presently employed as an independent contractor at a company named Ecogreen Tristate since August 2017. Id., pg. 21/10-25, 22, 1-7, pg. 22/18-22. Plaintiff testified that he requested and was paid by Ecogreen through Blue Ocean Entertainment Group. Id., pg. 24/3-8. When Plaintiff was asked the simple question of what his position at Ecogreen Tri-State was, the following colloquy took place:

> Q: What do you do for Ecogreen Tristate?
> A: Well, currently its up in the air as to whether or not, I would still be working there, but marketing, PR." Id., 22/6-10.

When simple questions were asked in an attempt to ascertain how much Plaintiff was paid by Ecogreen Tristate, the following colloquy took place:

> Q: How much have you been paid by Ecogreen Tristate?
> A: It's on commission.
> Q: How much have you been paid commission; total for 2017, total for 2018, and then total for 2019.
> A: It's a new company, so currently it's not much at all.
> Q: About how much?
> A: Initially, it started off with money of about 800 a week, but that stopped.
> Q: When was that? When were you paid $800 a week and when did it stop?
> A: It started in the beginning. When it stopped, I'm not sure....
> Q: Do you have pay stubs?
> A: No.
> Q. Do you have receipts?
> A: Not in my possession, no." Id., pg. 22/20-25, pg. 23/1-22, pg. 31/3-24.

Ecogreen's President confirmed to my private investigator that Plaintiff has never been employed by Ecogreen. In fact, neither EcoGreen's President nor his wife, the two owners of

6

Ecogreen, have ever met him. Ecogreen employed Plaintiff's husband Anjan and paid him through Blue Ocean. However, Ecogreen fired Anjan and described him as a "con man". We intend to call the owners of Ecogreen's owners at trial to impeach Plaintiff's credibility.

At his deposition, Plaintiff was asked if any information on his resume, other than his address, was incorrect or otherwise untrue. Id., pgs. 16/6-25, 17/2-12. We intend to subpoena all prior employers listed on Plaintiffs resume as upon information and belief, he did not work for any of them and/or greatly exaggerated his accomplishments. Those employers are Joseph Russo, Esq., Attorney-at-Law, Amato Pharmacy, Ecogreen and Medika Medical Supplies (Resume for Plaintiff is omitted as an Exhibit).

*Blue Ocean Entertainment Group*
*Was Dissolved by the State of New York*
*For Non-payment of Taxes in 2016*

At the time Plaintiff was hired by Defendants, in late October 2016, he requested to be paid as an independent contractor through Blue Ocean Entertainment Group, L.L.C. ("Blue Ocean"), rather than as a W-2 employee. Id., pg. 27/19-25, 28/1-8, 136/137-142. After being terminated by Defendants, Plaintiff alleges he went to work for Ecogreen Tristate, on or about February 2017. At his deposition, Plaintiff confirmed he requested Ecogreen[3] pay him as an Independent Contractor, through Blue Ocean. At the time Plaintiff was employed by Defendants and allegedly employed by Ecogreen, Blue Ocean did not exist as a legal entity. Rather, it had been dissolved by the New York State Secretary of State on August 31, 2016, for non-payment of taxes. At his deposition in 2018, Plaintiff claimed he was not aware that Blue Ocean had in fact been dissolved in 2016. Id., pg. 25/9-13. At his deposition, Plaintiff conceded

---

[3] As addressed earlier, the President of Ecogreen confirmed to me that Plaintiff never worked for them.

7

he has not filed any tax returns or paid taxes, for as long as he can remember. Id., pg. 28, 29 & 30. Blue Ocean, for which Plaintiff purports to be the Chief Operating Officer, has also not filed taxes and Plaintiff cannot recall when Blue Ocean last paid or filed. Id. Lastly, Plaintiff does not maintain a bank account and cannot remember when he last did. Id., pg. 156

*Plaintiff acknowledges having*
*Outstanding child support and*
*Liens entered against him*

Plaintiff conceded he failed to pay child support as ordered by the Family Court. Id., 48-52. However, Plaintiff does not know how much child support he owes and is oblivious to the fact that statutory interest has been accruing on the arrears since 2008. Id.

*Plaintiff claims to be Married to*
*His Business Partner in Blue Ocean*
*Anjan Awald*

Plaintiff claims that he became registered domestic partners with Anjan Awlad ("Anjan") in June 2015. Id., pg. 41. Although he cannot recall when, he claims he is now married to Anjan. He further alleges he and his husband reside in the upstairs portion of his mother's house and Mom pays all their expenses. Id., pg. 40, 41. Plaintiff claims that Anjan has no professional relationship with Blue Ocean. Id., pg. 43, 44. This testimony is contradicted by various entities and individuals who claim Anjan is affiliated with Blue Ocean. Plaintiff is not sure if Anjan has filed tax returns and confirmed that although they are married, the couple has not filed jointly. Id., 45, 46. Although we have independent information from reliable sources that Anjan works for Blue Ocean, Plaintiff testified that he does not work for Blue Ocean. Id., 43/3-25, 47/14-19, 49/18-21. Plaintiff claims his mother pays expenses for Anjan as well. Id.

8

*Plaintiff Cannot Establish More Than*
*Garden Variety Damages*

Plaintiff conceded his damages are limited to purported "anxiety, doubt, panic and recurring nightmares". Id., pg. 77, 81. The following colloquy took place on the record at Plaintiff's deposition.

> "Q: What damages have you suffered that have not been treated?
> A: I have anxiety. I have doubt in my performance at this point. Panic attacks. Recurring nightmares in regard to the incident." Id., pg. 77/5-11.

Defendants respectfully submit that emotional stress and damages, if any, are proximately caused by Plaintiff's life as a con man who owes substantial child support arrears and unpaid taxes and penalties going back decades. When questioned at his deposition about whether his lifestyle choices had led to his "anxiety", "panic attacks" and "nightmares", contributed to these symptoms, Plaintiff said "no". Id., pgs. 81, 82, 83, 84, 85, 86 & 87. He claims that the only factor that proximately causes his alleged symptoms are the incident with Mr. Grummons.

Additionally, Plaintiff absolutely refused to answer simple questions with simple answers. The following colloquy took place on the record.

> "Q: There are the damages you are seeking in your amended complaint. So what I am asking you is could the stress you are suffering from be caused by other factors in your life, most notably the amount of money that you owe the government?
> Counsel: Objection, you can answer.
> Q: You are shaking your head. It's a yes or no.
> A: Are you asking does that weigh on my conscience?
> Q: I am asking, does it cause you stress?
> A: What happened to me goes much more depth than the fact that is causes stress." Id., pg. 83/8-24.

9

*Plaintiff concedes he was*
*Frequently late for his shifts*

Plaintiff concedes he was late for a large number of shifts while employed by Defendants. Id., pg. 161-175, 201-205. However, without any documentary evidence or tape-recorded conversations with Mr. Grummons, he now claims he was told by Mr. Grummons that he could come in late. Id. This stands in stark contrast to text messages sent to him by Mr. Grummons raising serious concerns about his repeated lateness. In text messages to Mr. Grummons notifying him that he would be late, Plaintiff claimed he was working with "clients" and doing business. However, at his deposition he could not recall any of the clients' names or what type of "business" he was conducting with them. We respectfully submit Plaintiff's repeated lateness is the legitimate, non-discriminatory reason for his termination and a jury will agree.

## Dr. Siegel and His Report Are Properly Precluded

Dr. Siegel is the "in house" expert for Plaintiff's counsel's law firm, Derek Smith. Pursuant to subpoena, Dr. Siegel produced a list of cases in which he has been an expert for the Derek Smith. See Exhibit C. According to that list, Dr. Siegel was retained in 42 cases in 2017, 70 cases in 2018 and 22 cases from January to April 2019. The total number of cases Dr. Siegel admits to being retained in by the Derek Smith Law in the last three years as of April 2019 was 134! See Exhibit B. This fact alone with make Dr. Siegel an obviously conflicted witness, whose opinion will be given no weight by a finder of fact.

Dr. Siegel's client agreement executed by the Plaintiff confirms that he was not *treated* by Dr. Siegel but met with him solely for the purpose of preparing a forensic report for the Derek Smith. See Exhibit A, *pgs.* 90/13-19, 98, 98/13-25, 99, 100. Counsel for Plaintiff

instructed him not to answer my questions regarding how he came to his decision to meet with Dr. Siegel. Id., pgs. 90-96. Upon information and belief, Plaintiff was sent to see Dr. Siegel by his counsel Alex Calabreras. Id. Plaintiff did not pay Dr. Siegel and never submitted any bills for reimbursement by his medical insurance carrier. Id., 102/22-25, 103-4-6.

In his report, Dr. Siegel confirmed that Plaintiff was referred to him by the Derek Smith. See Exhibit E, Siegel Report, pg. 3. *Dr. Siegel did not contact any collateral sources to confirm facts communicated by Plaintiff.* See Exhibit E, pg. 111. Not one collateral source was interviewed, and no documents were ever requested or reviewed by Dr. Seigel as part of his "forensic' evaluation of Plaintiff. Id., 111-113. Moreover, Dr. Siegel did not recommend to Plaintiff that he make appointments for treatment with any other medical providers as a result of their meeting. Id., pg. 101/8-22. Plaintiff confirmed that since December 27, 2018 (his session with Dr. Siegel), he had not seen any other health professionals in relation to the damages he claims he has an is suffering.

Based upon that one occasion, Dr. Siegel authored a report on January 3, 2019, diagnosing Plaintiff with post-traumatic stress disorder or ("PTSD"). See Exhibit C, pg. 8. Since his one consultation with Dr. Siegel, Plaintiff has not seen Dr. Siegel. Moreover, Dr. Siegel did not provide Plaintiff with any recommendations whatsoever regarding professionals he recommended Plaintiff see to be treated for his purported PTSD. See Exhibit A, pgs. 103, 104.

At his one and only consult with Dr. Siegel, *Plaintiff either lied, made facts up, or omitted critical facts as confirmed at his deposition*. The following outright lies, exaggerated statements or omissions were confirmed at the Plaintiff's deposition:

- Plaintiff confirmed he did not disclose to Dr. Siegel that he cannot remember the last time he filed and paid his taxes. According to Plaintiff, the issue never came up during his meeting with Dr. Siegel.

- Plaintiff confirmed he did not disclose he cannot remember how much child support he owes. According to Plaintiff, the issue never came up during his meeting with Dr. Siegel.

- Plaintiff confirmed he did not disclose all of his living expenses are paid by his 73-year-old retired mother. According to Plaintiff, the issue never came up during his meeting with Dr. Siegel.

- Plaintiff confirmed he did not disclose he lives in his 73-year-old mothers house without contributing to any expenses. Id., pg. 87/23-25,88/2-3. According to Plaintiff, the issue never came up during his meeting with Dr. Siegel.

- Plaintiff confirmed at his deposition that even though he is in his mid-fifties, he is in the "closet" and his mother does not know he is gay. According to Plaintiff, the issue never came up during his meeting with Dr. Siegel.

- Plaintiff confirmed at his deposition that the fact that he is in a same-sex marriage is a secret from all members of his family including his children and mother. Id., pgs. 84-90, 132-133, 157/9-17. According to Plaintiff, the issue never came up during his meeting with Dr. Siegel.

- At his deposition, Plaintiff confirmed he told Dr. Siegel he worked for Lehman Brothers, but failed to mention he allegedly worked there twenty-five years ago. Id., pg. 131/11-16.

- Plaintiff failed to disclose to Dr. Siegel he has not held a job that actually *pays* him (except the Townhouse) in decades.

- Plaintiff failed to disclose to Dr. Siegel he has not been paid on the books or in an otherwise traceable fashion for at least the last decade.

- Plaintiff told Dr. Siegel there was "no" stress whatsoever in his marriage. Id., 103. Given he keeps his recent same sex marriage a secret, he must have been refereeing to the acrimonious divorce from his wife years ago. The divorce and acrimony with his ex-wife over custody were not disclosed to Dr. Siegel.

- Plaintiff also failed to disclose to Dr. Siegel that he was allegedly hit by a car crossing a street in Jamaica, Queens, and alleges injuries so sever he sought treatment at Jamaica Hospital and has a personal injury attorney retained to represent him. Id.,

12

pg. 114-115. Plaintiff omitted this information from his responses to Interrogatories. Id., pg. 116-117, 134.[4]

- Plaintiff did not give Dr. Siegel the names of any family members who could corroborate his extreme and pervasive emotional distress and claimed no such witnesses exist. Id., 112/4-15.

- Plaintiff confirmed that no friends ever witnessed him manifest any of the symptoms he claims to be suffering. Id., pg. 112/17-19.

- After substantial argument and attempts to evade simple answers, Plaintiff conceded the report of Dr. Siegel was solely based upon his self-reported data.

Given all of the foregoing, Dr. Siegel's statements that Plaintiff "worked throughout his adult life, holding jobs with Lehman Brothers, East Side Gynecology, Shawnee Medical and [as] an actor on soap operas" is laughable. See Exhibit E, pg. 4, ¶14. Dr. Siegel continued by stating "[Plaintiff explained that his career has been negatively affected by the harassment and wrongful termination". Id. What career is Dr. Siegel referring to? The report relies on no collateral sources and no medical records to reach bizarre conclusions that are highly prejudicial to Defendants. The report simply parrots back self-reported lies from the Plaintiff, without even the most due diligence to confirm the self-reported data. Given the Plaintiff's propensity to lie, break the law by not filing and paying taxes and manipulate reality to suit his distorted belief system, the failure of Dr. Siegel to conduct due diligence fatally flaws his report and testimony.

---

[4] At his deposition Plaintiff testified that he was taken to Jamaica Hospital by ambulance. Id., pg. 114, 17-22. However, documents subsequently obtained from personal injury counsel indicated he went to Jamaica Hospital the next day on his own. Plaintiff lies about almost everything to try and present the best facts possible as he perceives them at that moment. Truth means nothing to the Plaintiff.

*The Purported "Harassing Recording" is
Properly Precluded*

The only piece of evidence that corroborates Plaintiff's claims and adds value to the Amended Complaint, is a purported recorded conversation between Plaintiff and Mr. Grummons. Plaintiff's counsel has termed this purported conversation the "harassing recording". Mr. Grummon's has consistently stated the conversation did not take place. At his deposition, Plaintiff confirmed he used an Android Galaxy 6 phone to record the conversation. Id., pg. 65/18-19. He further testified the original recordings would be on his phone. Id., 66/10-14. Plaintiff denied altering the recording in any way. Id., pg. 67/3-25, 68/1-12. Plaintiff transmitted a copy of the purported recording to his lawyer by downloading it. Id., 68/13-21

*Defendant's Expert Has
Determined the Harassing
Recording is a Fake*

Defendants retained Dennis Walsh, a retired NYPD Detective, highly experienced and respected in the forensic audio field, to review the recording and opine on its authenticity. After substantial forensic examination, our expert authored a report dated May 17, 2019, wherein he confirmed that to a reasonable degree of scientific certainty, the recording in not authentic. See Exhibit D, Report of Dennis Walsh dated May 17, 2019. Mr. Walsh determined the recording has characteristics that confirm it was tampered with by someone who was not well trained or experienced in audio tampering. See Exhibit D.

*The Report of Plaintiff's Audio*
*Expert is Properly Stricken*

On September 20, 2019, the Defendants served the report of a purported "expert" in audio analysis, Arlo H. West ("West"). See Exhibit E.   In the West Report, Mr. West fails to explain to explain what audio file he reviewed for purposes of his report, how the sample audio file was provided to him (given he lives and works in Maine), a chain-of-custody for the audio file he examined, the specific scientific techniques he utilized, the equipment he utilized, and by whom or whether he was given access to the phone utilized by Plaintiff for purposes of his analysis. See West Report, pgs. 1-6. We also do not know who paid for the report, Plaintiff of Derek Smith.  The report also alludes to waveform analysis and Mr. West's interpretation of those waveforms.  However, he does not include the actual waveforms printouts if available which are critical, given he goes on to conclude "it is uncommon to have so many clicks and pop...and there are 32 instances of clicks and pops which could not be identified". Id., pg. 7. Mr. West then describes these 32 clicks as problematic" and concedes they "could be considered suspect from a forensic point of view", he fails to analysis each and every one of the suspect clicks. Id., pg. 7

## ARGUMENT

### Dr. Siegel's Report Is Properly Precluded

The Federal Rules of Evidence ("FRE") 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: is (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Expert testimony and reports are also properly excluded under FRE 403 if the subject matter therein has no relevance to the issues in dispute. See Danley v. Bayer, 2016 U.S. LEXIS 29752 (S.D.N.Y. 2016). It is well-settled that the Court may, in its discretion, admit expert testimony upon the proper showing of the factors enunciated in FRE 702 as interpreted by the United States Supreme Court in Daubert v. Merrell Dow Pharm, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993). It is Defendants' position that Plaintiff has not made such a proper showing as required by Daubert and its progeny in relation to both experts.

All precedent interpreting Daubert require that the expert not only review the underlying data upon which the expert's testimony is based, but also use reliable and consistent methods, generally accepted in the expert community of which the expert is apart. Although the Second Circuit employs a liberal rule regarding admissibility of expert reports, that rule is not liberal enough to permit in hearsay, speculation or conjecture. The Second Circuit has held that when an "expert opinion is based upon data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Nimely v. City of New York, 414 F.3d 381, 396 (2nd Cir. 2005). See, also Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81 (2nd Cir. 1997).

In Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265, the Second Circuit stated that this standard means "the district must make certain than an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field". Id., 303 F.3d 265. "When an expert opinion is based on data, methodology, or studies that are

simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony.  Id. 303 at 266.

*The Report of West Should Be Precluded*
*Or a Hearing Held*

If not outright excludable like the "report" authored by Dr. Siegal's Report, the West Report contains glaring technical and procedural omissions that cannot be cured on paper. Rather, a Daubert hearing is properly held to determine the sufficiency of the underlying data, methods and procedures utilized by Mr. West before ruling on its admissibility.

## Conclusion

For all the foregoing reasons, the report of Dr. Siegel and Mr. West are properly precluded pursuant to Rule 702, Daubert and the multiple rulings of the Second Circuit cited herein.  In the alternative, A Daubert hearing should be scheduled so these two experts can be examined under oath subject to cross-examination before the Court issues a decision on this motion.

Dated: New York., New York
       November 20, 2019

Thomas D. Shanahan
Thomas D. Shanahan, P.C.
551 Fifth Avenue, Thirty-Five Floor
New York, New York 10176
(212) 867-1100, x11